# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ADVANTAGECARE REHABILITATION, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>WILEY MISSION and SYMBRIA REHAB, INC.,<br><br>Defendants. | ) | 2:24-cv-229 |

## OPINION

**J. Nicholas Ranjan, United States District Judge**

AdvantageCare Rehabilitation, LLC, is a provider of therapy services, things like PT, OT, and speech services. AdvantageCare contracted to provide five employees to Wiley Mission's retirement community facility for about a year, starting in 2021. The relationship soured during the year, and Wiley ultimately decided to terminate its contract early. Wiley decided to, instead, contract with Symbria Rehab, Inc., a competitor to AdvantageCare.

Wiley, however, did not want to part with the facility staff, who were AdvantageCare employees. Wiley expressed to Symbria its desire to retain the five AdvantageCare employees who had been working at Wiley. The problem with that, though, was the non-solicitation or no-hire provision in the Wiley/AdvantageCare contract. As part of that provision, Wiley had agreed not to hire AdvantageCare employees who had worked at Wiley's facility, and not to hire another therapy services provider who employed such employees. Symbria tried to work around this by negotiating a buyout of the employees with AdvantageCare. But they couldn't

come to a deal. Undeterred, Symbria went ahead anyway and hired the employees despite the no-hire provision in Wiley's and AdvantageCare's contract.

In response, AdvantageCare sued. It brought a claim for breach of contract against Wiley and a claim for tortious interference against Symbria. It sought only money damages, and no equitable relief. The parties engaged in fact and expert discovery, and Wiley and Symbria have now moved for summary judgment.

After careful review, the Court will deny the summary-judgment motions, but narrow some categories of damages that AdvantageCare can seek at trial from Symbria as part of its tortious-interference claim.

**BACKGROUND**

Wiley is a nonprofit church corporation that houses a retirement community on its church campus in Marlton, New Jersey. ECF 69-1, at 1; ECF 69-2, at 2–3. Wiley's facility offers therapy services that Wiley originally provided directly to its residents, until its Director of Rehab Services retired. ECF 69-2, at 6.

In September 2021, following the retirement, Wiley began to negotiate with AdvantageCare for it to contract out rehab services to Wiley. ECF 73-2, at 5. AdvantageCare provided a form contract containing a provision prohibiting Wiley from soliciting AdvantageCare's employees, either directly or indirectly (*e.g.*, by contracting with another provider who solicits the employees). ECF 69-1, at 11; ECF 69-3, at 5; ECF 69-16, at 2–3. At the request of Wiley's CEO, Gary Gilmore, AdvantageCare added language to allow Wiley to retain its current staff if the agreement with AdvantageCare was terminated. ECF 69-2, at 7.

Article 10 of the operative contract, thus contained the following non-solicitation clause:

> During the term of this Agreement, and for (1) year following termination of the agreement, neither [Wiley] nor the Facility shall directly or indirectly (*e.g.*, by hiring or using another individual or entity that hires or engages AdvantageCare's employees or contractors . . . ),

> employ or contract with (a) any AdvantageCare employee, agent or representative who provided, managed or otherwise was involved in the provision of Services at the Facility . . . . [Wiley] shall not talk or communicate in any fashion directly or indirectly via agents, recruiters or otherwise including but not limited to blind ads to and/or [*sic*] induce any AdvantageCare employee, agent or representative to terminate his/her relationship with AdvantageCare. . . . The parties acknowledge that a breach of the covenants contained in this Article 10 shall have irreparable, material and adverse effects on AdvantageCare and damages arising from any such breach may be difficult to ascertain. Without limiting any other available remedies, AdvantageCare shall have . . . the right to liquidated damages in an amount equal to one hundred (100%) of the employee's annual salary. [Wiley] . . . agrees to pay for all attorney's fees and costs associated with AdvantageCare's enforcement of this provision. All staff retained from Facility are exempt from the non-solicitation clause.

ECF 69-1, at 11.

The contract also provided that "either party may terminate [the contract] at any time, with or without cause, effective upon delivery to the other party of at least thirty (30) days prior written notice of termination." *Id.* at 8 (citation modified). Even after termination, however, the parties agreed that the obligations imposed by the non-solicitation clause would be ongoing. *Id.*

As Wiley's service provider, AdvantageCare provided five employees to staff Wiley's facility: (1) Alicia Redfern, Director of Rehab; (2) Danielle Greer, Occupational Therapist; (3) Roopinder Rekhi, Physical Therapist; (4) Raquel Screnci, PT Assistant; and (5) Etan Haziza, Speech Therapist. ECF 73-2, at 6–8; ECF 73-7, at 20. None of the five had a non-compete agreement with AdvantageCare. ECF 69-3, at 56.

Around September 2022, Wiley began communicating with AdvantageCare's competitor, Symbria, about potentially using Symbria instead. *See* ECF 73-21, at 3; ECF 73-23, at 5. Discussions between Wiley and Symbria continued through the end of 2022. *See* ECF 73-25. As part of those discussions, Wiley informed Symbria that, if Wiley were to contract with Symbria, it would want to keep the facility's current staff (*i.e.*, the five AdvantageCare employees). ECF 73-27, at 1.

By July 2023, Wiley and Symbria were finalizing their agreement, with Symbria telling Wiley it would negotiate with AdvantageCare to secure the release of the five AdvantageCare employees from the non-solicitation clause. ECF 73-8, at 5. On August 3, 2023, Wiley provided AdvantageCare with notice of their contract's termination, effective September 17, 2023. ECF 73-14, at 2.

On August 5, 2023, Britt Mills, the Regional Director for Symbria, shared a link to the job openings with Wiley's President and CEO, Greg Gilmore, telling him, "If you'd like to share this link with the staff, that would be great." ECF 73-6, at 1–2; ECF 73-62, at 2. Mr. Gilmore forwarded this email to Ms. Redfern, the AdvantageCare Director of Rehab at Wiley. ECF 73-6, at 1. This was before Ms. Mills had spoken with anyone at AdvantageCare regarding release of the employees. ECF 73-65, at 1.

On August 9, 2023, Colleen Balsano, AdvantageCare's Vice President of Operations, told Mr. Gilmore in an email: "Our HR team will be contacting the current [AdvantageCare] staff at Wiley to let them know of positions we have open in Philadelphia. If the staff wish to stay at Wiley, and Symbria is interested in retaining them, I will discuss that point as it relates to the [non-solicitation clause] with Symbria directly." ECF 69-9, at 1–2.

On August 10, AdvantageCare and Symbria had a call to negotiate a buyout of the staff, but Symbria did not accept AdvantageCare's offers. ECF 69-3, at 31; ECF 73-7, at 18. Shortly after the call, Ms. Balsano reiterated that the buyout terms AdvantageCare provided on the call remained, and asked Symbria to let her know if Symbria was going to "to interview / hire any of the staff." ECF 73-46, at 2.

Despite not accepting AdvantageCare's buyout offer, Symbria extended offers to the five staff members on August 17 and 18. ECF 73-39; ECF 73-42; ECF 73-45; ECF 73-74; ECF 73-75.

At the same time, AdvantageCare extended offers for what it considered to be comparable positions at other AdvantageCare locations to the five staff members. ECF 73-22, at 2.

In an email to Ms. Redfern discussing AdvantageCare's comparable positions, Ms. Mills of Symbria wrote, "Please tell the team, that if they want to stay at Wiley with Symbria, we would love that and not to worry about the rest. We will handle it." ECF 73-73, at 1 (citation modified).

No deal was ever reached between Symbria and AdvantageCare, ECF 73-19, but Symbria began servicing Wiley's facility with the five former AdvantageCare employees as staff. ECF 73-62, at 7. This lawsuit followed.

## STANDARD OF REVIEW

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When deciding motions for summary judgment, the Court must determine whether the evidence presents "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). In making that determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." *A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791, 794 (3d Cir. 2007).

If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment is warranted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). For the non-moving party to prevail, "the non-moving party must present more than a mere scintilla of evidence; there must be evidence on which the jury could reasonably find for the non-movant." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013) (citation modified).

## DISCUSSION & ANALYSIS

### I. AdvantageCare's breach-of-contract claim survives summary judgment (Count I).

To prevail on a breach-of-contract claim, the plaintiff must prove "(1) the existence of a contract, including its essential terms, (2) a breach of the contract; and, (3) resultant damages." *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016). As to the first element, Wiley and Symbria argue that the non-solicitation clause is unenforceable and thus cannot be the basis of a claim for breach of contract or tortious interference. As explained below, however, the non-solicitation clause can serve as the basis of AdvantageCare's claims because the relief requested here is solely money damages.

Further, when viewing all evidence in the light most favorable to AdvantageCare, the Court determines that a jury could reasonably conclude that the contract was breached, which caused resultant damages.

#### A. The non-solicitation clause is enforceable.

The existence of a valid contract is a necessary element for claims of both breach of contract and tortious interference. *See Malone Middleman*, 137 A.3d at 1258 (elements of breach of contract); *Acumed LLC v. Advanced Surgical Servs.*, 561 F.3d 199, 212 (3d Cir. 2009) (elements of tortious interference with existing contractual relationship). Both Wiley and Symbria contend that the non-solicitation clause is unenforceable, and therefore cannot serve as the basis of either of AdvantageCare's claims. *See* ECF 66, at 13–19; ECF 68, at 7–22; ECF 75, at 7–12; ECF 76, at 1–4. Specifically, they argue that under Pennsylvania law, the non-solicitation clause is an unreasonable restraint of trade. ECF 66, at 17; ECF 68, at 7.

Defendants rely on *Pittsburgh Logistics Systems, Inc. v. Beemac Trucking, LLC*, a Pennsylvania Supreme Court case concerning the enforceability of non-

solicitation-of-employees (or no-hire) provisions. 249 A.3d 918 (Pa. 2021). In *Pittsburgh Logistics*, the Supreme Court applied a reasonableness test to weigh the employer's interest in the enforcement of the provision against the likelihood of harm to the public. *Id.* at 935-36. Wiley and Symbria argue that the same test applies for the non-solicitation clause at issue here.

The Court disagrees. There is one crucial distinguishing factor between *Pittsburgh Logistics* and this case: AdvantageCare is only seeking money damages in this case, not equitable relief. In *Pittsburgh Logistics*, the court reviewed only the denial of a preliminary injunction, and therefore did not address whether the non-solicitation provision could be the basis of an action for money damages. *See id.* at 922–24 (explaining procedural posture and the question on appeal).[1] Four points on this.

First, contrary to Wiley and Symbria's claims, nothing in the Pennsylvania Supreme Court's clearly indicates that the reasonableness test for non-solicitation provisions was meant to extend beyond cases seeking injunction. While the Court did use broad language in saying that the question is "whether no-hire, or 'no poach,' provisions . . . are enforceable **under the laws of this Commonwealth**," the Court's analysis wasn't so broad, and certainly didn't address the narrow issue here of whether the reasonableness analysis might apply to a case where a plaintiff is seeking only money damages. *Pittsburgh Logistics Sys.*, 249 A.3d at 920.

Second, the reasoning in *Pittsburgh Logistics* doesn't naturally extend to pure damages cases. For example, as the court there explained, one of the main public-

[1] Wiley's observation that the *Pittsburgh Logistics* plaintiff also sought money damages in the Court of Common Pleas does not change the fact that the Supreme and Superior Courts addressed only equitable relief. *See Pittsburgh Logistics*, 249 A.3d, *aff'g*, 202 A.3d 801 (Pa. Super. Ct. 2019).

policy concerns in layering on a reasonableness standard is that enforcement of a non-solicitation provision would basically sideline a person (who was never a party to a contract to begin with) from being able to work and earn a livelihood. *Id.* at 936. That isn't a driving concern in a money damages case, where, as here, an employee can still change jobs and continue to work, and the risk of liability for any money damages falls on third parties (like the new employer), not the employees.

Third, long-standing Pennsylvania precedent makes clear that public policy considerations pertaining to the reasonableness of a restraint on trade are irrelevant in actions at law. Nothing in *Pittsburgh Logistics* expressly or impliedly overrules this line of cases. *See Krauss v. M.L. Claster & Sons, Inc.*, 254 A.2d 1, 3 (Pa. 1969) ("In an action at law, the reasonableness of any given contractual term simply is not relevant."); *Aiken Indus., Inc. v. Est. of Wilson*, 383 A.2d 808, 811 n.5 (Pa. 1978) (Pomeroy, J.) (equally divided court) ("Because the action for injunctive relief was withdrawn . . . we need not be concerned with the reasonableness of the terms of the covenant."); *Boyce v. Smith-Edwards-Dunlap Co.*, 580 A.2d 1382, 1386 (Pa. Super. Ct. 1990) ("Generally, to be enforceable, a restrictive covenant in an employment contract must be reasonably limited in both time and territory. However, following, *Krauss*, we conclude that, because this is an action at law, the reasonableness of the restrictive covenant is not relevant." (citation modified)).

Fourth, at least one state trial court has considered this issue, and found that *Pittsburgh Logistics* is cabined to cases seeking equitable relief. *WebPageFX, Inc. v. BMarko Structures, LLC*, No. 2020-CV-12168, 2022 Pa. Dist. & Cnty. Dec. LEXIS 913, at *15 (Pa. Com. Pl. May 5, 2022) (holding that "the *Pittsburgh Logistics* reasonableness test does not apply here because Plaintiff has not sought equitable relief. . . . As such, this Court agrees with Plaintiff that *Pittsburgh Logistics* does not preclude its action."). Although this decision isn't binding on this Court, the Court finds it persuasive. *See Nationwide Mut. Ins. Co. v. Buffetta*, 230 F.3d 634, 637 (3d

Cir. 2000) ("A federal court can also give due regard, but not conclusive effect, to the decision law of lower state courts." (citation modified)).

For these reasons, the Court finds that *Pittsburgh Logistics* is not relevant here. In this action for solely money damages, the non-solicitation clause is not subject to a reasonableness test and so is enforceable.

**B. There is sufficient evidence that Wiley breached the contract.**

**1. The non-solicitation clause did not exempt the AdvantageCare employees.**

Defendants next argue that even if the non-solicitation provision is enforceable, by its terms, Wiley didn't breach it. They rely on an exemption in the clause, which reads, "All staff retained from [Wiley's] Facility are exempt from the non-solicitation clause." ECF 69-1, at 11. Wiley and Symbria argue that the exemption applies to the former AdvantageCare employees because they were employees who worked at Wiley's facility, and thus were "retained" at the facility when Symbria took over. ECF 66, at 19–20; ECF 68, at 39. AdvantageCare, on the other hand, argues that this exemption only applies to the Wiley employees that Wiley had retained before it entered into the contract with AdvantageCare. ECF 72, at 30–33.

AdvantageCare is right. Pennsylvania courts, when interpreting contracts, seek to "determine the intent of the parties and give effect to all of the provisions therein." *Capek v. Devito*, 767 A.2d 1047, 1050 (Pa. 2001) (citing *Commonwealth of Penn., Dept. of Transp. v. Manor Mines, Inc.*, 565 A.2d 428, 432 (Pa. 1989)). That "an interpretation will not be given to one part of the contract which will annul another part of it" is a recognized principle of contractual interpretation. *Id. at* 1050 (citation modified) (quoting *Cerceo v. DeMarco*, 137 A.2d 296, 298 (Pa. 1958)).

If the exemption did apply to all AdvantageCare employees who were employed at Wiley's facility and stayed after Wiley found another provider, then what effect

would the non-solicitation clause have? Neither Wiley nor Symbria provide a possible interpretation. The plain text of the non-solicitation clause prevents Wiley from directly or indirectly hiring "any AdvantageCare employee . . . who provided, managed or otherwise was involved in the provision of Services at the Facility." ECF 69-1, at 11. This prohibition would be annulled by understanding the exemption, coming just a few sentences later, to include AdvantageCare employees at the Wiley facility who stayed at the facility after the termination of the agreement.

The plain reading of the clause, giving effect to all provisions, is that the exemption refers to employees at the facility, *before* the agreement with AdvantageCare, who were "retained" at the start of the agreement with AdvantageCare. Therefore, the former AdvantageCare employees are not exempt from the non-solicitation clause.[2]

**2. There is sufficient evidence that Wiley breached the clause by indirectly hiring the former employees.**

AdvantageCare has provided sufficient evidence for a jury to conclude that Wiley violated its contractual obligations by indirectly hiring the former employees. Wiley argues that it did not breach the non-solicitation clause because Symbria is a wholly separate entity from Wiley, and that Wiley did not control Symbria's hiring decisions. ECF 68, at 40.

Wiley's argument that the former employees were employed by Symbria and not by Wiley is irrelevant. The non-solicitation clause provides examples of what is meant by "indirectly" hire. It includes "hiring or using another individual or entity that hires or engages AdvantageCare's employees or contractors." ECF 69-1, at 11.

[2] Because the meaning is clear from text of the contract, the Court does not rely on extrinsic evidence. *See Capek*, 767 A.2d at 1050 ("When a written contract is clear and unequivocal, its meaning must be determined by its contents alone." (citation modified)). However, the Court notes that Mr. Gilmore, Wiley's CEO, agreed, in his deposition, that he had asked for the ability to retain Wiley's rehab staff employed before contracting with AdvantageCare. ECF 73-2, at 9.

Wiley concedes that it contracted with Symbria after terminating its agreement with AdvantageCare, and that Symbria hired former AdvantageCare employees who were assigned to the Wiley facility. ECF 68, at 1. That alone is enough to establish a breach.

Even if it weren't, the factual record would allow a jury to find that Wiley played a role in Symbria hiring the former employees. Before Wiley signed the agreement with Symbria, Mr. Gilmore expressed his desire to keep the former employees and he was aware that Symbria intended to honor his wish. *See* ECF 73-27, at 1; ECF 73-8, at 5 (email to Mr. Gilmore mentioning transitioning the staff to Symbria).

While Wiley describes a scenario where the former employees all independently applied once Symbria opened the position, the evidence is sufficient for a jury to conclude otherwise. For example, Mr. Gilmore, after being provided a link for the facility's job postings from Symbria—and being told that it "would be great" if he sent it to the staff—forwarded it to Ms. Redfern. ECF 73-6, at 1–2. A jury could find that this at least shows Wiley's knowledge that Symbria would hire former employees and that Wiley helped to facilitate the hiring, all before Symbria had communicated with AdvantageCare.

**3. AdvantageCare is not estopped from bringing this claim.**

Wiley asserts as a defense that AdvantageCare is equitably estopped because AdvantageCare's statements induced Wiley to believe that Symbria had permission to hire the former employees. ECF 68, at 34–39.

To establish equitable estoppel, the party claiming estoppel must show that there is "(1) an inducement, whether by act, representation, or silence when one ought to speak, that causes one to believe the existence of certain facts; (2) justifiable reliance on that inducement; and (3) prejudice to the one who relies if the inducer is permitted to deny the existence of such facts." *Chem. Bank v. Dippolito*, 897 F. Supp.

221, 224 (E.D. Pa. 1995) (citing *Zivari v. Willis*, 611 A.2d 293, 295 (Pa. Super. Ct. 1992)). The party claiming estoppel has the burden of establishing these elements by "clear, precise and unequivocal evidence." *Id.*

Wiley points to several statements and actions from AdvantageCare that Wiley claims induced it to believe that Symbria was allowed to hire the former employees.

For example, in one email to Mr. Gilmore, Ms. Balsano stated, "If the staff wish to stay at Wiley, and Symbria is interested in retaining them, I will discuss that point . . . with Symbria directly. It is common in the industry that the two therapy companies work that out together. We've been on both sides of the coin." ECF 69-9, at 2. Ms. Mills also told Mr. Gilmore that it was common for therapy providers to exchange staff. ECF 69-15, at 15. Wiley also points to statements from AdvantageCare to Symbria, where Ms. Balsano told Symbria, "Please let us know if you will be proceeding to interview / hire [the five employees]." ECF 73-46, at 2; *see also* ECF 69-16, at 10. Other actions include AdvantageCare allegedly allowing Symbria to have conversations with the staff. ECF 69-15, at 14, 19; ECF 69-17, at 5.

However, as AdvantageCare correctly observes, "the flexibility of the doctrine of equitable estoppel does not allow it to be imposed where the essential elements of inducement and reliance are supported solely by speculation." *Novelty Knitting Mills, Inc. v. Siskind*, 457 A.2d 502, 505 (Pa. 1983) (citation modified). Indeed, the doctrine does not apply when the alleged inducement and reliance were based on one party's unjustified misunderstanding of the other party's actions. *See id.* at 504 ("Rather than showing that Bernette induced Novelty to rely on a promise never delivered, our review of the record shows that Novelty's claims amount to little more than speculation to support an illusory promise.").

The asserted statements do not provide evidence of inducement and reliance beyond Wiley's speculation that a deal would be reached. Indeed, the statements very clearly show that Wiley was only led to believe that Symbria and AdvantageCare

were negotiating a deal. AdvantageCare never told Wiley that a deal was reached, and was always clear that the ability of Symbria to hire the former employees was contingent on the two providers reaching an agreement. Wiley believing that an agreement would definitely be reached based on statements that "it is common in the industry" is mere speculation. Therefore, AdvantageCare is not estopped from bringing this claim.[3]

**B. There is sufficient evidence of damages to proceed to trial.**

Finally, Wiley argues that AdvantageCare has failed to show that the alleged breach caused damages. For the reasons explained below, AdvantageCare has produced sufficient evidence on damages.

Wiley claims that the liquidated damages provision, allowing AdvantageCare to recover 100% of the former employees' annual salaries, is an unenforceable penalty. ECF 67, at 19–21. The Court disagrees.

Under Pennsylvania law, liquidated damages provisions are enforceable if they "(1) address damages that are difficult or impossible to measure and (2) [are] a reasonable estimate of those damages." *Cardiology Care for Child. Inc. v. Ravi*, No. 5:17-cv-4743, 2018 WL 1870717, at *4 (E.D. Pa. Apr. 18, 2018) (quoting *ZA Consulting, LLC v. Wittman*, Nos. 3941, 110378, 2002 WL 34100475, at *6 (C.P. Jan. 9, 2002)).

AdvantageCare claims that the alleged breach caused AdvantageCare to incur costs related to employee training, onboarding, back-office work, and loss of employees who were provided proprietary information. ECF 72, at 38. Pennsylvania courts have found that "damages for loss of time in training an employee are 'difficult to measure.'" *Cardiology Care for Child.*, 2018 WL 1870717, at *4 (citing *Mannino v.*

[3] At least based on this record, there is nothing even suggesting that equitable estoppel could even be a triable defense for the jury to decide. That said, because AdvantageCare didn't affirmatively move for summary judgment as to that defense, the Court will not reject it as a matter of law at this juncture.

*Lazerpro, Inc.*, 76 Pa. D. & C. 4th 526, 535 (C.P. 2005)). Therefore, the Court will focus its analysis on "whether the agreed-upon amount of damages in the liquidated damages provision . . . is unreasonable." *Id.* at *4.

Pennsylvania courts have allowed liquidated damages in breaches of restrictive covenants that are tied to the salary of an employee. For example, in *Omicron Systems, Inc v. Weiner*, the Superior Court upheld an award of liquidated damages for a non-compete agreement equal to the amount the employee had been paid by the rival company. 860 A.2d 554, 557 n.1 (Pa. Super. Ct. 2004). The Superior Court affirmed by noting that damages arising from the breach of a non-compete are difficult to calculate, and that the employer proved the employee's salary by sufficient evidence. *Id.* at 565. The court did not calculate whether the liquidated damages was approximately the same as the actual damages caused by the breach.

Similarly, in *Lehigh Valley Bone, Muscle & Joint Group LLC v. Puccio*, the Court of Common Pleas in Lehigh County granted an award of liquidated damages for violation of a restrictive covenant. 75 Pa. D & C.4th 176 (C.P. 2005), *aff'd*, 903 A.2d 61 (Pa. Super. Ct. 2006) (unpublished table decision). The court justified the $100,000 award, in part, by comparing it to the salary of the employee ($180,000–200,000 per year) and concluding it was reasonable. *Id.* at 186. Once again, the court did not examine whether the actual damages arising from the breach were approximately the same as the award.

Further, in *Cardiology Care*, the Eastern District of Pennsylvania declined to dismiss a claim for liquidated damages for breach of an employment contract where the damages were 10% more than the first year's salary. 2018 WL 1870717, at *4. At the motion-to-dismiss stage, the court there noted that the doctor's training and time

off for continuing medical education likely explain the high cost of the damages.[4] *Id.* at *4.

The Court therefore finds that the liquidated damages amount here is facially reasonable. Wiley has not adduced any evidence suggesting that the annual-salary calculation is so out of whack to make the clause an unenforceable penalty.

Therefore, since costs relating to training are hard to estimate, and employment salaries are usually not an unenforceable penalty for restrictive covenants the Court finds that the liquidated-damages provision here is valid.[5]

---

[4] Wiley's attempts to distinguish the above cases fail. For example, Wiley explains that *Lehigh Valley* concerned a signed non-compete. ECF 76, at 6. The Court, however, cannot discern the relevance of this distinction, nor does Wiley explain it. As for *Omicron Systems*, Wiley claims that AdvantageCare misrepresents the holding as the Superior Court did not find that an annual salary is a reasonable award of liquidated damages, as AdvantageCare claims, but that the Superior Court actually held that the former employer was "entitled to the amount of profit earned by the newly formed company because it was attributable to the appellant's violations of the non-compete and confidentiality agreement." ECF 76, at 7. But it is Wiley who misunderstands *Omicron Systems*, not AdvantageCare. The damages were not the profits earned by the competitor company, but the income earned by the employee in his twenty-two months of employment with the competitor before the trial. *Omicron Sys., Inc.*, 860 A.2d at 557 n.1. The amount reflected the gross income gained by the employee after the breach, and the Superior Court did not attempt to calculate the damage done to the non-breaching former employer. *Id.* at 565. Although the case did also address a non-disclosure agreement, the liquidated damages provision applied only to the non-compete. *Id.* at 565 n.6.

[5] Wiley makes two other damages-related arguments. It argues that AdvantageCare hasn't established a causal link between its breach and any claimed damages. ECF 68, at 26–34. It also takes issue with a damages report submitted by Stephen Brown. ECF 76, at 7–8. These issues are too fact-bound for the Court to decide at summary judgment. Regardless, the Court doesn't need to reach these issues. This is so because, at a minimum, AdvantageCare has presented sufficient evidence of breach, and based on that breach, can seek liquidated damages. There is no need to establish a causal link (now or at trial) to obtain liquidated damages. *See Sutter Corp. v. Tri-Boro Mun. Auth.*, 487 A.2d 933, 936 (Pa. Super. Ct. 1985) ("As a general rule of law it is not necessary to show any actual damages in order to recover liquidated damages pursuant to a contract providing for liquidated damages." (citing *5 Corbin, Contracts Section* 1062)).

## II. AdvantageCare's tortious-interference claim survives summary judgment (Count II).

To prevail on a claim of tortious interference with an existing contractual relationship, the plaintiff must prove: (1) the existence of a contractual relationship between the plaintiff and a third party; (2) purposeful action by the defendant, specifically intended to harm an existing relationship; (3) the absence of privilege of justification on the part of the defendant; and (4) legal damage to the plaintiff as a result of the defendant's conduct. *Acumed*, 561 F.3d at 212.

As explained above, the non-solicitation clause is a valid agreement, so the first element is met. As explained below, there is sufficient evidence for the tortious-interference claim to survive summary judgment.

### A. Symbria's conduct is not privileged.

Symbria argues that its conduct in contracting with Wiley and hiring the former employees falls under the competitor's privilege. ECF 66, at 21–23; ECF 75, at 13–17. While Symbria and AdvantageCare are competitors, the conduct does not meet the requirements to qualify as competitor's privilege.

Pennsylvania courts have adopted section 768 of the Second Restatement of Torts, which only allows claims of competitor's privilege when the contract is terminable at will. *See Acumed*, 561 F.3 at 215 ("[O]ne who intentionally causes a third person . . . not to continue an existing contract terminable at will does not interfere improperly with the other's relation [if the section 768 requirements are met]." (quoting Restatement (Second) of Torts § 768 (A.L.I. 1979))).

Although the agreement allowed either party to terminate the agreement with thirty days' notice, the non-solicitation clause's obligations continued for one year after the termination. ECF 69-1, at 8, 11. The competitor's privilege does not apply to a contract that is partially terminable at will when the alleged breach was to a provision with ongoing obligations. *See Acclaim Sys., Inc. v. Infosys, Ltd.*, No. 13-

7336, 2015 WL 4257463, at *3 n.2 (E.D. Pa. July 14, 2015) ("While the analysts could end their employment at will, the non-compete clauses in the contracts could not be terminated at will—those had a set term of two years."); *see also* Restatement (Second) of Torts § 768 cmt. i (A.L.I. 1979) ("An employment contract, however, may be only partially terminable at will. . . . Under these circumstances a defendant engaged in the same business might induce the employee to quit his job, but he would not be justified in engaging the employee to work for him in an activity that would mean violation of the contract not to compete.").

Symbria argues that the Restatement's commentary and *Acclaim Systems* are irrelevant because they specifically address non-competes in employment contracts, not non-solicitation-of-employees agreements. ECF 75, at 15–16. However, because the competitor's privilege requires an agreement be terminable at will, and the non-solicitation clause is a continuing obligation, the same logic applies to this dispute. Thus, the competitor's privilege doesn't shield Symbria, and Symbria can be liable for inducing Wiley to break the agreement.

**B. AdvantageCare has produced evidence of purposeful action.**

AdvantageCare has put forward evidence that would allow a jury to conclude that Symbria engaged in purposeful action intended to harm AdvantageCare's contractual relationship with Wiley.

Under Pennsylvania law, when the competitor's privilege does not apply, the plaintiff must just prove that the defendant used "improper means." *Acclaim Sys.*, 2015 WL 4257463, at *4. Improper means can include the defendant knowing about a restrictive covenant, inducing one party to the contract to breach the covenant, and then taking actions to avoid liability. *See Acclaim Sys.*, 2015 WL 4257463, at *4 ("If, as alleged, [the defendant] was aware of the non-compete agreements but nonetheless caused the analysts to defect to Infosys, then [the defendant] would have indeed specifically intended to induce the breach of the contract.").

According to the factual record, Symbria was aware of the non-solicitation clause at least as early as July 6, 2023. ECF 73-8, at 5. This was before it extended offers to the AdvantageCare employees on August 17 and 18. ECF 73-39; ECF 73-42; ECF 73-45; ECF 73-74; ECF 73-75. Symbria made those offers despite the lack of an agreement with AdvantageCare. ECF 73-73, at 1.

Further, a jury could find that Symbria encouraged Wiley to breach the non-solicitation clause when Ms. Mills told Mr. Gilmore that it "would be great" if he sent Symbria's job postings to the facility's staff, ECF 73-6, at 1–2, despite the clause prohibiting Wiley from "communicating in any fashion . . . to . . . induce any AdvantageCare employee . . . to terminate his/her relationship with AdvantageCare." ECF 69-1, at 11 (citation modified).

Because the non-solicitation clause is enforceable in an action at law, AdvantageCare has provided sufficient evidence of purposeful action.

**C. AdvantageCare has produced evidence that it suffered damages caused by Symbria's interference.**

Finally, Symbria argues that, even if the tortious-interference claim was otherwise valid, AdvantageCare has not established recoverable damages from the alleged interference. ECF 66, at 23–26. AdvantageCare claims damages for lost revenue and profit resulting from losing the five employees; time spent recruiting, onboarding, and training the former employees; and lost revenue from the early cancellation of the contract. ECF 74, at 35–36.

A party can recover lost profits from its tortious-interference claim if "(1) there is evidence to establish the damages with reasonable certainty; (2) the damages were the proximate cause of the wrong; and (3) the damages were reasonably foreseeable." *REVZIP, LLC v. McDonnell*, No. 3:19-cv-191, 2025 WL 2201836, at *17 (W.D. Pa. Aug. 4, 2025) (Stickman, J.) (citation modified) (quoting *Brisbin v. Superior Valve Co.*, 398 F.3d 279, 289 (3d Cir. 2005)).

AdvantageCare's Vice President of Finance has provided a report calculating the lost revenue and profit resulting from the loss of the former employees. *See* ECF 73-82. The revenue earned by the former employees may have gone to AdvantageCare if it weren't for Symbria's tortious-interference. A jury could plausibly accept the findings of the report as proof of loss profits and revenue. *Miller ex rel. Miller v. Evenflo Co.*, No. 3:09-108, 2011 WL 7037127, at *2 n.2 (W.D. Pa. Dec. 15, 2011) (Gibson, J.) ("The Court, however, will not entertain such a challenge to the credibility of the opinion of Plaintiff's expert at the summary judgment stage). Therefore, the motion for summary judgment is denied as to AdvantageCare's claim for damages for lost profits.

That said, the Court holds that AdvantageCare may not recover the costs for the time spent recruiting, onboarding, and training the former employees. Courts applying Pennsylvania law have only allowed recovery "where the benefit at issue profits the defendant only." *Fishkin v. Susquehanna Partners, G.P.*, No. 03-3766, 2007 WL 560703, at *7 (E.D. Pa. Feb. 12, 2007), *aff'd*, 340 F. App'x 110 (3d Cir. 2009). Therefore, when the original employer benefited from the training while the employees are still employed, the original employer cannot seek to recover restitution for the costs of training. *Id.* ("As a consequence, the restitution SIG seeks for the value of its training would not serve to return SIG to the position it held before the parties' contract, but would instead give SIG an unwarranted windfall." (citation modified)). AdvantageCare, therefore, cannot recover the costs of recruiting, onboarding, and training the former employees.

AdvantageCare also may not recover for damages stemming from the termination of the contract other than those caused by the alleged violation of the non-solicitation clause. AdvantageCare seeks lost revenue and profit due to the contract being cancelled 440 days prematurely. ECF 74, at 36. While AdvantageCare claims that Wiley would not have terminated the contract but for its knowledge that

Symbria would hire the employees and its reliance on Symbria's "false promise" to provide a Kinetisense machine to the facility, arguments nearly identical to this have been held insufficient. *See Acclaim Sys.*, 2016 WL 974136, at *12 ("Not only is this assertion made without any citation to relevant factual or legal authority, the argument tacitly acknowledges that Acclaim is attempting to recover damages for its loss of TWC business, not the loss of the subcontractor's services.").

As AdvantageCare concedes in its response, "the contract itself was terminable at-will and Symbria was privileged to compete unless it utilized 'wrongful means'" or interfered with the non-solicitation clause. ECF 74, at 34. Terminating the contract early was not prohibited under the non-solicitation clause. Further, AdvantageCare's argument implies that AdvantageCare is seeking damages for the loss of business, not the violation of the non-solicitation clause.

To the extent AdvantageCare is suggesting that Symbria's allegedly false promise to provide a Kinetisense machine was wrongful means, the assertion is not supported by the record. The only evidence AdvantageCare provides to establish this wrongful means are communications showing that the Kinetisense machine was offered to Wiley by Symbria, the Kinetisense machine was one of several reasons that Wiley went with Symbria, and Wiley had not received the Kinetisense by November 2023. ECF 73-29; ECF 73-30; ECF 73-77; ECF 73-78; ECF 73-81. AdvantageCare fails to demonstrate that the promise was made in bad faith or intended to be deceptive. Thus, AdvantageCare has not shown that it can recover for the early termination of the contract.

## CONCLUSION

For the above reasons, the Court hereby **DENIES** Wiley's summary-judgment motion (ECF 67) and Symbria's summary-judgment motion (ECF 65), but limits the categories of damages AdvantageCare may pursue for its tortious-interference claim.

DATED this 15th day of October, 2026.

BY THE COURT:

/s/ *J. Nicholas Ranjan*
United States District Judge